## CHICKASAW NATION *v.* UNITED STATES

No. 00–507.   Argued October 2, 2001—Decided November 27, 2001*

---

*Together with *Choctaw Nation of Oklahoma* v. *United States* (see this Court's Rule 12.4), also on certiorari to the same court.

BREYER, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, KENNEDY, and GINSBURG, JJ., joined, and in which

Scalia and Thomas, JJ., joined as to all but Part II–B. O'Connor, J., filed a dissenting opinion, in which Souter, J., joined, *post*, p. 96.

*Graydon Dean Luthey, Jr.,* argued the cause for petitioners. With him on the briefs were *Stephen W. Ray, Bob W. Rabon,* and *Dennis W. Arrow.*

*Edward C. DuMont* argued the cause for the United States. With him on the brief were *Solicitor General Olson, Acting Assistant Attorney General Fallon, Deputy Solicitor General Wallace, Gary R. Allen,* and *David English Carmack.*†

JUSTICE BREYER delivered the opinion of the Court.*

In these cases we must decide whether a particular subsection in the Indian Gaming Regulatory Act, 102 Stat. 2467–2486, 25 U. S. C. §§ 2701–2721 (1994 ed.), exempts tribes from paying the gambling-related taxes that chapter 35 of the Internal Revenue Code imposes—taxes that States need not pay. We hold that it does not create such an exemption.

I

The relevant Indian Gaming Regulatory Act (Gaming Act) subsection, as codified in 25 U. S. C. § 2719(d)(1), reads as follows:

---

†Briefs of *amici curiae* urging reversal were filed for the San Carlos Apache Tribe by *Richard T. Treon;* for the San Manuel Band of Serrano Mission Indians by *Jerome L. Levine* and *Frank R. Lawrence;* for the Seminole Tribe of Florida et al. by *Hans Walker, Jr.,* and *Judith A. Shapiro;* and for the Shakopee Mdewakanton Sioux (Dakota) Community et al. by *Mark J. Streitz* and *Michael J. Wahoske.*

Briefs of *amici curiae* urging affirmance were filed for the town of Ledyard, Connecticut, et al. by *Benjamin S. Sharp, Guy R. Martin,* and *Donald C. Mitchell.*

Briefs of *amici curiae* were filed for the Lower Sioux Indian Community in Minnesota et al. by *James M. Schoessler, Henry M. Buffalo, Jr., Mark A. Anderson,* and *Dennis J. Peterson;* and for the Muscogee (Creek) Nation by *L. Susan Work.*

*JUSTICE SCALIA and JUSTICE THOMAS join all but Part II–B of this opinion.

"The provisions of [the Internal Revenue Code of 1986] (including sections 1441, 3402(q), 6041, and 6050I, and chapter 35 of such [Code]) concerning the reporting and withholding of taxes with respect to the winnings from gaming or wagering operations shall apply to Indian gaming operations conducted pursuant to this chapter, or under a Tribal-State compact entered into under section 2710(d)(3) of this title that is in effect, in the same manner as such provisions apply to State gaming and wagering operations."

The subsection says that Internal Revenue Code provisions that "concer[n] the reporting and withholding of taxes" with respect to gambling operations shall apply to Indian tribes in the same way as they apply to States. The subsection also says in its parenthetical that those provisions "includ[e]" Internal Revenue Code "chapter 35." Chapter 35, however, says nothing about the *reporting* or the *withholding* of taxes. Rather, that chapter simply *imposes* taxes—excise taxes and occupational taxes related to gambling—from which it exempts certain state-controlled gambling activities. See, *e. g.,* 26 U. S. C. § 4401(a) (1994 ed.) (imposing 0.25% excise tax on each wager); § 4411 (imposing $50 occupational tax on each individual engaged in wagering business); § 4402(3) (exempting state-operated gambling operations, such as lotteries).

In this lawsuit two Native American Indian Tribes, the Choctaw and Chickasaw Nations, claim that the Gaming Act subsection exempts them from paying those chapter 35 taxes from which States are exempt. Brief for Petitioners 34–36. They rest their claim upon the subsection's explicit parenthetical reference to chapter 35. The Tenth Circuit rejected their claim on the ground that the subsection, despite its parenthetical reference, applies only to Code provisions that concern the "reporting and withholding of taxes." 208 F. 3d 871, 883–884 (2000); see also 210 F. 3d 389 (2000). The Court of Appeals for the Federal Circuit, however, reached the

opposite conclusion. *Little Six, Inc.* v. *United States*, 210 F. 3d 1361, 1366 (2000). We granted certiorari in order to resolve the conflict. We agree with the Tenth Circuit.

## II

The Tribes' basic argument rests upon the subsection's explicit reference to "chapter 35"—contained in a parenthetical that refers to four other Internal Revenue Code provisions as well. The subsection's language outside the parenthetical says that the subsection applies to those Internal Revenue Code provisions that concern "reporting and withholding." The other four parenthetical references are to provisions that concern, or at least arguably concern, reporting and withholding. See 26 U. S. C. § 1441 (1994 ed. and Supp. V) (withholding of taxes for nonresident alien); § 3402(q) (withholding of taxes from certain gambling winnings); § 6041 (reporting by businesses of payments, including payments of gambling winnings, to others); § 6050I (reporting by businesses of large cash receipts, arguably applicable to certain gambling winnings or receipts).

But what about chapter 35? The Tribes correctly point out that chapter 35 has nothing to do with "reporting and withholding." Brief for Petitioners 28–29. They add that the reference must serve some purpose, and the only purpose that the Tribes can find is that of expanding the scope of the Gaming Act's subsection beyond reporting and withholding provisions—to the tax-imposing provisions that chapter 35 does contain. The Gaming Act therefore must exempt them (like States) from those tax payment requirements. The Tribes add that at least the reference to chapter 35 makes the subsection ambiguous. And they ask us to resolve the ambiguity by applying a special Indian-related interpretative canon, namely, "'statutes are to be construed liberally in favor of the Indians with ambiguous provisions interpreted to their benefit.'" *Id.*, at 13 (quoting *Montana* v. *Blackfeet Tribe*, 471 U. S. 759, 766 (1985)).

We cannot accept the Tribes' claim. We agree with the Tribes that rejecting their argument reduces the phrase "(including . . . chapter 35) . . ." to surplusage. Nonetheless, we can find no other reasonable reading of the statute.

## A

The language of the statute is too strong to bend as the Tribes would wish—*i. e.,* so that it gives the chapter 35 reference independent operative effect. For one thing, the language outside the parenthetical is unambiguous. It says without qualification that the subsection applies to "provisions . . . concerning the reporting and withholding of taxes." And the language inside the parenthetical, prefaced with the word "including," literally says the same. To "include" is to "contain" or "comprise as part of a whole." Webster's Ninth New Collegiate Dictionary 609 (1985). In this instance that which "contains" the parenthetical references—the "whole" of which the references are "parts"—is the phrase "provisions . . . concerning the reporting and withholding of taxes . . . ." The use of parentheses emphasizes the fact that that which is within is meant simply to be illustrative, hence redundant—a circumstance underscored by the lack of any suggestion that Congress intended the illustrative list to be complete. Cf. 26 U. S. C. § 3406 (1994 ed.) (backup withholding provision not mentioned in parenthetical).

Nor can one give the chapter 35 reference independent operative effect without seriously rewriting the language of the rest of the statute. One would have to read the word "including" to mean what it does not mean, namely, "including . . . and." One would have to read the statute as if, for example, it placed "chapter 35" outside the parenthetical and said "provisions of the . . . Code *including chapter 35 and also provisions* . . . concerning the reporting and withholding of taxes . . . ." Or, one would have to read the language as if it said "provisions of the . . . Code . . . concerning *the taxation and* the reporting and withholding of taxes . . . ."

We mention this latter possibility because the congressional bill that became the law before us once did read that way. But when the bill left committee, it contained not the emphasized words ("the taxation and") but the cross-reference to chapter 35.

We recognize the Tribes' claim (made here for the first time) that one could avoid rewriting the statute by reading the language outside the parenthetical as if it referred to two kinds of "provisions of the . . . Code": first, those "concerning the reporting and withholding of taxes with respect to the winnings from gaming," and, second, those "concerning . . . wagering operations." See Reply Brief for Petitioners 8–10. The subsection's grammar literally permits this reading. But that reading, even if ultimately comprehensible, is far too convoluted to believe Congress intended it. Nor is there any reason to think Congress intended to sweep within the subsection's scope every Internal Revenue Code provision concerning wagering—a result that this unnatural reading would accomplish.

The subject matter at issue also counsels against accepting the Tribes' interpretation. That subject matter is tax exemption. When Congress enacts a tax exemption, it ordinarily does so explicitly. We can find no comparable instance in which Congress legislated an exemption through an inexplicit numerical cross-reference—especially a cross-reference that might easily escape notice.

As we have said, the more plausible role for the parenthetical to play in this subsection is that of providing an illustrative list of examples. So considered, "chapter 35" is simply a bad example—an example that Congress included inadvertently. The presence of a bad example in a statute does not warrant rewriting the remainder of the statute's language. Nor does it necessarily mean that the statute is ambiguous, i. e., "capable of being understood in two or more possible senses or ways." Webster's Ninth New Collegiate Dictionary 77 (1985). Indeed, in ordinary

life, we would understand an analogous instruction—say, "Test drive some cars, including Plymouth, Nissan, Chevrolet, Ford, and Kitchenaid"—not as creating ambiguity, but as reflecting a mistake. Here too, in context, common sense suggests that the cross-reference is simply a drafting mistake, a failure to delete an inappropriate cross-reference in the bill that Congress later enacted into law. Cf. *Little Six, Inc.* v. *United States,* 229 F. 3d 1383, 1385 (CA Fed. 2000) (Dyk, J., dissenting from denial of rehearing en banc) ("The language of the provision has all the earmarks of a simple mistake in legislative drafting").

## B

The Gaming Act's legislative history on balance supports our conclusion. The subsection as it appeared in the original Senate bill applied both to taxation and to reporting and withholding. It read as follows:

> "Provisions of the Internal Revenue Code . . . concerning *the taxation and* the reporting and withholding of taxes with respect to gambling or wagering operations shall apply to Indian gaming operations . . . the same as they apply to State operations." S. 555, 100th Cong., 1st Sess., 37 (1987).

With the "taxation" language present, it would have made sense to include chapter 35, which concerns taxation, in a parenthetical that included other provisions that concern reporting and withholding. But the Senate committee deleted the taxation language. Why did it permit the cross-reference to chapter 35 to remain? Committee documents do not say.

The Tribes argue that the committee intentionally left it in the statute in order to serve as a *substitute* for the word "taxation." An *amicus* tries to support this view by pointing to a tribal representative's testimony that certain Tribes were "opposed to any indication where Internal Revenue

would be collecting taxes from the tribal bingo operations." Hearings on S. 555 and S. 1303 before the Senate Select Committee on Indian Affairs, 100th Cong., 1st Sess., 109 (1987) (statement of Lionel John, Executive Director of United South and Eastern Tribes). Other Tribes thought the "taxation" language too "vague," preferring a clear statement "that the Internal Revenue Service is not being granted authority to tax tribes." *Id.*, at 433, 435 (statement of Charles W. Blackwell, Representative of the American Indian Tribal Government and Policy Consultants, Inc.).

Substitution of "chapter 35" for the word "taxation," however, could not have served the tribal witnesses purposes, for doing so took from the bill the very words that made clear the tribes would *not* be taxed and substituted language that made it more likely they would be taxed. Nor can we believe that anyone seeking to grant a tax exemption would intentionally substitute a confusion-generating numerical cross-reference, see Part II-A, *supra*, for pre-existing language that unambiguously carried out that objective. It is far easier to believe that the drafters, having included the entire parenthetical while the word "taxation" was still part of the bill, unintentionally failed to remove what had become a superfluous numerical cross-reference—particularly since the tax-knowledgeable Senate Finance Committee never received the opportunity to examine the bill. Cf. S. Doc. No. 100-1, Senate Manual 30 (1987) (proposed legislation concerning revenue measures shall be referred to the Committee on Finance).

Finally, the Tribes point to a letter written by one of the Gaming Act's authors, stating that "by including reference to Chapter 35," Congress intended "that the tax treatment of wagers conducted by tribal governments be the same as that for wagers conducted by state governments under Chapter 35." App. to Pet. for Cert. 113a. This letter, however, was written after the event. It expresses the views of only one member of the committee. And it makes no

effort to explain the critical legislative circumstance, namely, the elimination of the word "taxation" from the bill. The letter may express the Senator's interpretive preference, but that preference cannot overcome the language of the statute and the related considerations we have discussed. See *Heintz* v. *Jenkins*, 514 U. S. 291, 298 (1995) (A "statement [made] not during the legislative process, but *after* the statute became law . . . is not a statement upon which other legislators might have relied in voting for or against the Act, but it simply represents the views of one informed person on an issue about which others may (or may not) have thought differently"). Cf. *New York Telephone Co.* v. *New York State Dept. of Labor*, 440 U. S. 519, 564, n. 18 (1979) (Powell, J., dissenting) ("The comments . . . of a single Congressman, delivered long after the original passage of the [act at issue], are of no aid in determining congressional intent . . .").

In sum, to adopt the Tribes' interpretation would read back into the Act the very word "taxation" that the Senate committee deleted. We ordinarily will not assume that Congress intended "'to enact statutory language that it has earlier discarded in favor of other language.'" *INS* v. *Cardoza-Fonseca*, 480 U. S. 421, 443 (1987) (quoting *Nachman Corp.* v. *Pension Benefit Guaranty Corporation*, 446 U. S. 359, 392–393 (1980)); *Gulf Oil Corp.* v. *Copp Paving Co.*, 419 U. S. 186, 200 (1974) (same); *Mescalero Apache Tribe* v. *Jones*, 411 U. S. 145, 157 (1973) (same). There is no special reason for doing so here.

## C

The Tribes point to canons of interpretation that favor their position. The Court has often said that "'every clause and word of a statute'" should, "'if possible,'" be given "'effect.'" *United States* v. *Menasche*, 348 U. S. 528, 538–539 (1955) (quoting *Montclair* v. *Ramsdell*, 107 U. S. 147, 152 (1883)). The Tribes point out that our interpretation deprives the words "chapter 35" of any effect. The Court has also said that "statutes are to be construed liberally in favor

of the Indians with ambiguous provisions interpreted to their benefit." *Montana* v. *Blackfeet Tribe*, 471 U.S., at 766; *South Carolina* v. *Catawba Tribe, Inc.*, 476 U.S. 498, 520 (1986) (Blackmun, J., dissenting). The Tribes point out that our interpretation is not to the Indians' benefit.

Nonetheless, these canons do not determine how to read this statute. For one thing, canons are not mandatory rules. They are guides that "need not be conclusive." *Circuit City Stores, Inc.* v. *Adams*, 532 U.S. 105, 115 (2001). They are designed to help judges determine the Legislature's intent as embodied in particular statutory language. And other circumstances evidencing congressional intent can overcome their force. In this instance, to accept as conclusive the canons on which the Tribes rely would produce an interpretation that we conclude would conflict with the intent embodied in the statute Congress wrote. Cf. *Choteau* v. *Burnet*, 283 U.S. 691 (1931) (upholding taxation where congressional intent reasonably clear); *Superintendent of Five Civilized Tribes* v. *Commissioner*, 295 U.S. 418 (1935) (same); *Mescalero Apache Tribe* v. *Jones, supra* (same). In light of the considerations discussed earlier, we cannot say that the statute is "fairly capable" of two interpretations, cf. *Montana* v. *Blackfeet Tribe, supra*, at 766, nor that the Tribes' interpretation is fairly "possible."

Specific canons "are often countered . . . by some maxim pointing in a different direction." *Circuit City Stores, Inc.* v. *Adams, supra*, at 115. The canon requiring a court to give effect to each word *"if possible"* is sometimes offset by the canon that permits a court to reject words "as surplusage" if "inadvertently inserted or if repugnant to the rest of the statute . . . ." K. Llewellyn, The Common Law Tradition 525 (1960). And the latter canon has particular force here where the surplus words consist simply of a numerical cross-reference in a parenthetical. Cf. *Cabell Huntington Hospital, Inc.* v. *Shalala*, 101 F. 3d 984, 990 (CA4 1996)

("A parenthetical is, after all, a parenthetical, and it cannot be used to overcome the operative terms of the statute").

Moreover, the canon that assumes Congress intends its statutes to benefit the tribes is offset by the canon that warns us against interpreting federal statutes as providing tax exemptions unless those exemptions are clearly expressed. See *United States* v. *Wells Fargo Bank*, 485 U. S. 351, 354 (1988) ("[E]xemptions from taxation . . . must be unambiguously proved"); *Squire* v. *Capoeman*, 351 U. S. 1, 6 (1956) ("[T]o be valid, exemptions to tax laws should be clearly expressed"); *United States Trust Co.* v. *Helvering*, 307 U. S. 57, 60 (1939) ("Exemptions from taxation do not rest upon implication"). Nor can one say that the pro-Indian canon is inevitably stronger—particularly where the interpretation of a congressional statute rather than an Indian treaty is at issue. Cf. *post*, at 100 (O'CONNOR, J., dissenting). This Court's earlier cases are too individualized, involving too many different kinds of legal circumstances, to warrant any such assessment about the two canons' relative strength. Compare, *e. g.*, *Choate* v. *Trapp*, 224 U. S. 665, 675–676 (1912) (interpreting statement in treaty-related Indian land patents that land is "nontaxable" as creating property right invalidating later congressional effort to tax); *Squire, supra*, at 3 (Indian canon offsetting tax canon when related statutory provision and history make clear that language freeing Indian land "'of all charge or incumbrance whatsoever'" includes tax); *McClanahan* v. *Arizona Tax Comm'n*, 411 U. S. 164, 174 (1973) (state tax violates principle of Indian sovereignty embodied in treaty), with *Mescalero, supra* (relying on tax canon to find Indians taxable); *Choteau, supra* (language makes clear no exemption); *Five Tribes, supra* (same).

Consequently, the canons here cannot make the difference for which the Tribes argue. We conclude that the judgments of the Tenth Circuit must be affirmed.

*It is so ordered.*

JUSTICE O'CONNOR, with whom JUSTICE SOUTER joins, dissenting.

The Court today holds that 25 U. S. C. § 2719(d) (1994 ed.) clearly and unambiguously fails to give Indian Nations (Nations) the exemption from federal wagering excise and related occupational taxes enjoyed by the States. Because I believe § 2719(d) is subject to more than one interpretation, and because "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit," *Montana* v. *Blackfeet Tribe*, 471 U. S. 759, 766 (1985), I respectfully dissent.

I

I agree with the Court that § 2719(d) incorporates an error in drafting. I disagree, however, that the section's reference to chapter 35 is necessarily that error.

As originally proposed in the Senate, the bill that became the Indian Gaming Regulatory Act (IGRA) would have applied all gambling and wagering-related sections of the Internal Revenue Code to the Nations in the same manner as the States:

> "Provisions of the Internal Revenue Code of 1986, concerning the taxation and the reporting and withholding of taxes with respect to gambling or wagering operations shall apply to Indian gaming operations conducted pursuant to this Act the same as they apply to State operations." S. 555, 100th Cong., 1st Sess., 37 (1987).

The Senate Indian Affairs Committee altered the language of this bill in two contradictory ways. It restricted the applicable Code sections to those relating to the "reporting and withholding of taxes with respect to the winnings" from gaming operations. 25 U. S. C. § 2719(d). It also added a parenthetical listing specific Code sections to be applied to the Nations in the same manner as the States, including

chapter 35, a Code provision that relates to gambling opera-
tions generally, but not to the reporting and withholding
of gambling winnings. *Ibid.*

One of these two changes must have been made in error.
There is no reason to assume, however, that it must have
been the latter. It is equally likely that Congress intended
§ 2719(d) to apply chapter 35 to the Nations, but adopted
too restrictive a general characterization of the applicable
sections.

The Court can do no more than speculate that the bill's
drafters included the parenthetical while the original re-
striction was in place and failed to remove it when that
restriction was altered. See *ante,* at 92. Both the inclusion
of the parenthetical and the alteration of the restriction
occurred in the Senate committee, S. Rep. No. 100–446
(1988), and there is no way to determine the order in which
they were adopted. If the parenthetical was added after
the restriction, one could just as easily characterize the
*restriction* as an unintentional holdover from a previous
version of the bill.

True, reading the statute to grant the Nations the exemp-
tion requires the section's reference to the "reporting and
withholding of taxes with respect to the winnings" from
gaming operations to sustain a meaning the words them-
selves cannot bear. But the Court's reading of the statute
fares no better: It requires excising from § 2719(d) Con-
gress' explicit reference to chapter 35. This goes beyond
treating statutory language as mere surplusage. See *Potter*
v. *United States,* 155 U. S. 438, 446 (1894) (the presence of
statutory language "cannot be regarded as mere surplusage;
it means something"); cf. *ante,* at 89. Surplusage is redun-
dant statutory language, *Babbitt* v. *Sweet Home Chapter,
Communities for Great Ore.,* 515 U. S. 687, 697–698 (1995);
W. Popkin, Materials on Legislation: Political Language and
the Political Process 214 (3d ed. 2001)—the Court's reading

negates language that undeniably bears separate meaning. This is not a step to be undertaken lightly.

*Both* approaches therefore require rewriting the statute, see *ante,* at 89. Neither of these rewritings is necessarily more "serious" than the other: At most, each involves doing no more than reversing a change made in committee. Cf. *ante,* at 90.

The Court argues that, because the reference to chapter 35 occurs in a parenthetical, negating this language does less damage to the statute than concluding that the restrictive language outside the parenthetical is too narrowly drawn. I am aware of no generally accepted canon of statutory construction favoring language outside of parentheses to language within them, see, *e. g.,* W. Eskridge, P. Frickey, & E. Garrett, Legislation and Statutory Interpretation, App. C (2000) (listing canons), nor do I think it wise for the Court to adopt one today. The importance of statutory language depends not on its punctuation, but on its meaning. See *United States Nat. Bank of Ore.* v. *Independent Ins. Agents of America, Inc.,* 508 U. S. 439, 454 (1993) ("[A] purported plain-meaning analysis based only on punctuation is necessarily incomplete and runs the risk of distorting a statute's true meaning").

The fact that the parenthetical is illustrative does not change the analysis: If Congress' illustration does not match its general description, there is as much reason to question the description as the illustration. Where another general description is possible—and was in fact part of the bill at an earlier stage—Congress' choice of an example that matches the earlier description is at least ambiguous. Moreover, as §2719(d)'s parenthetical specifically lists statutory sections to be applied to the Nations, one might in fact conclude that the doctrine that the specific governs the general, *Crawford Fitting Co.* v. *J. T. Gibbons, Inc.,* 482 U. S. 437, 445 (1987), makes this specific parenthetical even more significant than the general restriction that follows.

Nor is negating Congress' clear reference to chapter 35 required by the policy behind the statute. If anything, congressional policy weighs in favor of the Nations. Congress' central purpose in enacting IGRA was "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments." §2702(1). Exempting Nations from federal gaming taxation in the same manner as States preserves the Nations' sovereignty and avoids giving state gaming a competitive advantage that would interfere with the Nations' ability to raise revenue in this manner.

## II

Because nothing in the text, legislative history, or underlying policies of §2719(d) clearly resolves the contradiction inherent in the section, it is appropriate to turn to canons of statutory construction. The Nations urge the Court to rely upon the Indian canon that "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit," *Montana* v. *Blackfeet Tribe*, 471 U. S., at 766, as a basis for deciding that the error in §2719(d) lies in the restriction of the subclass, not in the specific listing of chapter 35. "[R]ooted in the unique trust relationship between the United States and the Indians," *County of Oneida* v. *Oneida Indian Nation of N. Y.*, 470 U. S. 226, 247 (1985), the Indian canon presumes congressional intent to assist its wards to overcome the disadvantages our country has placed upon them. Consistent with this purpose, the Indian canon applies to statutes as well as treaties: The form of the enactment does not change the presumption that Congress generally intends to benefit the Nations. *Montana* v. *Blackfeet Tribe, supra; County of Yakima* v. *Confederated Tribes and Bands of Yakima Nation*, 502 U. S. 251 (1992). In these cases, because Congress has chosen gaming as a means of enabling the Nations to achieve self-sufficiency, the Indian canon rightly dictates

that Congress should be presumed to have intended the Nations to receive more, rather than less, revenue from this enterprise.

Of course, the Indian canon is not the only canon with potential applicability in these cases. Also relevant is the taxation principle, that exemptions from taxation must be clearly expressed. *United States Trust Co.* v. *Helvering*, 307 U. S. 57, 60 (1939); see also *ante*, at 95. These canons pull in opposite directions, the former favoring the Nations' preferred reading, and the latter favoring the Government's.

This Court has repeatedly held that, when these two canons conflict, the Indian canon predominates. In *Choate* v. *Trapp*, 224 U. S. 665 (1912), a State attempted to rely on the taxation principle to argue that a treaty provision making land granted to Indians nontaxable was merely a bounty, capable of being withdrawn at any time. The Court acknowledged the taxation principle, responding:

> "But in the Government's dealings with the Indians, the rule is exactly the contrary. The construction, instead of being strict, is liberal; doubtful expressions, instead of being resolved in favor of the United States, are to be resolved in favor of [Indian nations.]" *Id.*, at 674–675.

In *Squire* v. *Capoeman*, 351 U. S. 1, 3 (1956), the Federal Government had conveyed land to the Nations " 'free of all charge or encumbrance whatsoever.' " Although this phrase did not expressly mention nontaxability, the Court held that the language "might well be sufficient to include taxation," *id.*, at 7. Invoking the Indian canon, *id.*, at 6–7, we found the Nations exempt.

Likewise, in *McClanahan* v. *Arizona Tax Comm'n*, 411 U. S. 164 (1973), this Court inferred an exemption from state taxation of property inside reservations from a treaty reserving lands for the exclusive use and occupancy of the Nations. In doing so, the Court noted: "It is true, of course, that exemptions from tax laws should, as a general rule, be

clearly expressed. But we have in the past construed language far more ambiguous than this as providing a tax exemption for Indians." *Id.*, at 176 (citing *Squire, supra,* at 100).

As the purpose behind the Indian canon is the same regardless of the form of enactment, *supra,* at 99, there is no reason to alter the Indian canon's relative strength where a statute rather than a treaty is involved. Cf. *ante,* at 95. The primacy of the Indian canon over the taxation principle should not be surprising, as this Court has also held that the general presumption supporting the legality of executive action must yield to the Indian canon, a "counterpresumption specific" to Indians. *Minnesota* v. *Mille Lacs Band of Chippewa Indians,* 526 U. S. 172, 194, n. 5 (1999).

This Court has failed to apply the Indian canon to extend tax exemptions to the Nations only when nothing in the language of the underlying statute or treaty suggests the Nations should be exempted. *The Cherokee Tobacco,* 11 Wall. 616, 618, 620 (1871) (finding no exemption for the Nations from language imposing taxes on certain " 'articles produced anywhere within the exterior boundaries of the United States' "); *Choteau* v. *Burnet,* 283 U. S. 691, 693–694 (1931) (finding no exemption in provisions "subject[ing] the income of 'every individual' to tax," including "income 'from any source whatever' "); *Superintendent of Five Civilized Tribes* v. *Commissioner,* 295 U. S. 418 (1935) (same); *Mescalero Apache Tribe* v. *Jones,* 411 U. S. 145, 155 (1973) (refusing to exempt the Nations from taxes on land use income based on language that "[o]n its face . . . exempts land and rights in land, not income derived from its use"). *Mescalero* also went further, suggesting that because of the taxation principle, the Court would refuse to find such an exemption absent "clear statutory guidance." *Id.*, at 156. *Mescalero*'s formulation is admittedly in tension with the Court's precedents giving the Indian canon primacy over the taxation principle where statutory language is ambiguous. As *Mescalero* was

decided on the same day as one of those very precedents, the unanimous decision in *McClanahan* v. *Arizona Tax Comm'n, supra,* however, it cannot have intended to alter the Court's established practice.

Section 2719(d) provides an even more persuasive case for application of the Indian canon than any of our precedents. Here, the Court is not being asked to create out of vague language a tax exemption not specifically provided for in the statute. Instead, the Nations simply ask the Court to use the Indian canon as a tiebreaker between two equally plausible (or, in these cases, equally implausible) constructions of a troubled statute, one which specifically makes chapter 35's tax exemption applicable to the Nations, and one which specifically does not. Breaking interpretive ties is one of the least controversial uses of any canon of statutory construction. See Eskridge, Frickey, & Garrett, Legislation and Statutory Interpretation, at 341 ("The weakest kind of substantive canon operates merely as a *tiebreaker* at the end of the interpretive analysis").

Faced with the unhappy choice of determining which part of a flawed statutory section is in error, I would thus rely upon the long-established Indian canon of construction and adopt the reading most favorable to the Nations.