# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-3577

_____

| | | |
|---|---|---|
| Owner-Operator Independent Drivers Association, Inc.; Joseph Rajkovacz; Carl Schaefer; Carl Schaefer, LLC, individually and on behalf of all others similarly situated, | * * * * * * | |
| | * | |
| Appellants, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| Supervalu, Inc., | * | |
| | * | |
| Appellee. | * | |

_____

Submitted: October 19, 2010
Filed: August 11, 2011(Corrected: 08/12/2011)

_____

Before SMITH, COLLOTON, and SHEPHERD, Circuit Judges.

_____

SMITH, Circuit Judge.

Owner-Operator Independent Drivers Association, Inc. ("OOIDA"), Joseph Rajkovacz, and Carl Schaefer, LLC ("Schaefer"), sued Supervalu, Inc. ("Supervalu") under 49 U.S.C. § 14103(a) for the reimbursement of fees associated with the loading and unloading of its trucks at Supervalu's facilities. In a pair of orders granting

summary judgment in Supervalu's favor, the district court[1] construed § 14103(a) to require that OOIDA prove, as part of its prima facie case, that (a) its truckers were not otherwise reimbursed by their respective shippers and (b) the amount of insurance coverage that Supervalu required OOIDA drivers to maintain was not unreasonable. According to the district court, OOIDA failed to present more than a scintilla of evidence as to either of these elements. Finally, the district court also construed § 14704(a)(1) to preclude the recovery of monetary relief as a remedy for the violations that OOIDA alleges. For the following reasons, we affirm.

## I. *Background*

As this is an appeal from the grant of summary judgment, we review and recite the facts in the light most favorable to OOIDA as the non-moving party. *Mirax Chem. Prods. Corp. v. First Interstate Commercial Corp.*, 950 F.2d 566, 569 (8th Cir. 1991). OOIDA, incorporated in Missouri and maintaining its principal place of business there, is a nonprofit trade association of truck drivers who own and operate heavy-duty trucks. Rajkovacz, also a Missouri citizen and a current member of OOIDA, was an independent truck owner-operator who delivered goods on a per-load basis. Likewise, Schaefer, a Delaware corporation maintaining its principal place of business in Ohio, is an independent owner-operator that delivers on a per-load basis. For simplicity, we will refer to OOIDA, Rajkovacz, and Schaefer collectively as, "OOIDA." Supervalu, a Delaware corporation headquartered in Minnesota, is a grocery wholesaler that received goods shipped by OOIDA.

This case involves a practice known in interstate-trucking parlance as "lumping." "Lumping" refers to the loading, and, more often, unloading of goods from a truck upon delivery. Naturally, the individuals who perform these loading and unloading services are commonly referred to as "lumpers." Prior to 2005,

---

[1]The Honorable John R. Tunheim, United States District Judge for the District of Minnesota.

opportunistic lumpers unaffiliated with Supervalu habitually congregated at the loading docks of Supervalu's distribution centers to solicit their services to OOIDA and other arriving truckers. But, in 2005, Supervalu contracted with professional unloading companies for their exclusive lumping services, resulting in only Supervalu's lumpers being present at its distribution centers. In March 2005, Supervalu instituted a new insurance coverage requirement applicable only to drivers like OOIDA, who opted to load or unload their own vehicles rather than hire Supervalu's new lumpers. As a precondition for self-loading/unloading, OOIDA and other truckers had to show proof of general-liability insurance significantly exceeding the minimum required by federal law.[2] In August 2005, Supervalu reduced the amount of insurance it required of self-loaders/unloaders,[3] and after OOIDA commenced the instant lawsuit on December 5, 2005, Supervalu finally relaxed its policy to require proof of insurance coverage merely matching federal law.

Nevertheless, on December 5, 2005, OOIDA, representing its members as well as other similarly situated truckers, filed this putative class action against Supervalu, alleging, *inter alia*,[4] that Supervalu's insurance-coverage requirement effectively required OOIDA drivers to purchase Supervalu's new lumping services, in violation of § 14103(a). Section 14103(a) requires that a truck owner or operator be

---

[2]Supervalu required self-loading/unloading drivers to show proof of general liability insurance of $3 million annual aggregate and $1 million per occurrence limit, automobile liability insurance in the amount of $1 million combined single limit coverage, and fidelity bond or crime insurance of $50,000 (Supervalu rescinded this final requirement shortly after its issuance).Section 31139(b)(2) of 49 United States Code requires proof of only $750,000 worth of insurance.

[3]In August 2005, Supervalu announced that it would require proof of only $1 million aggregate and $1 million per occurrence.

[4]Additionally, OOIDA sought relief under § 14103 (b), which makes unlawful any attempt to coerce a trucker into utilizing lumpers. Ultimately, the parties settled this coercion claim, thus, it is not part of OOIDA's appeal.

compensated when a shipper or receiver requires him or her to utilize lumpers. OOIDA contended that Supervalu, by ostensibly requiring self-loading/unloading truckers to tender proof of insurance exceeding statutory minimums, effectively compelled OOIDA truckers to purchase Supervalu lumping services at their own cost, with no subsequent reimbursement. For these alleged violations, OOIDA sought "restitution," as well as an "accounting and disgorgement of money paid by drivers for lumping services between March 28 and December 20 of 2005."

In response, Supervalu countered with three primary arguments. First, Supervalu contended that it never expressly required OOIDA under § 14103(a) to utilize its lumping service, and that self-loading/unloading truckers retained their prerogative to self-load/unload so long as they maintained adequate insurance. According to Supervalu, its insurance requirement could be construed as a requirement to hire lumpers only if Supervalu mandated an unreasonable amount of coverage. Alternatively, Supervalu urged that, even assuming *arguendo* that it required OOIDA to employ Supervalu lumpers, OOIDA produced no evidence of a violation under § 14103(a) because all plaintiff truck drivers were subsequently reimbursed their lumping fees by their respective shippers. As the basis for this contention, Supervalu relied on § 14103(a)'s plain language, which provides that:

> [w]henever a shipper or receiver of property requires that any person who owns or operates a motor vehicle transporting property in interstate commerce . . . be assisted in the loading or unloading of such vehicle, the shipper *or* receiver shall be responsible for providing such assistance or shall compensate the owner or operator for all costs with securing and compensating the person or persons providing such assistance.

(Emphasis added.)

Finally, Supervalu contended that, notwithstanding the merits of OOIDA's case, 49 U.S.C. § 14704(a)(1)'s remedial scheme authorizes only "injunctive relief" for

violations of § 14103, not "restitution" or an "accounting and disgorgement of money paid" as sought by OOIDA. *See* 49 U.S.C. § 14704(a)(1) ("A person may bring a civil action for injunctive relief for violations of sections 14102 and 14103.").

The district court set out its view of the law governing the case in two orders resolving two separate rounds of cross-motions for summary judgment. In the first order, dated November 29, 2006, the district court denied summary judgment to both parties on OOIDA's claim under § 14103(a). Specifically, the district court "agree[d] [with Supervalu] that the reasonableness of the insurance coverage requirement is key to the determination of whether Supervalu violated § 14103(a)[,]" and that "Supervalu cannot be considered to have required the use of lumpers solely by its imposition of a requirement for insurance above the statutory minimum if the insurance coverage requirement is reasonable." Construing the requirement's reasonableness to be a disputed issue of material fact, and noting that merits discovery was in its infancy, the district court denied both parties' motions for summary judgment.

Additionally, the court denied OOIDA's motion to strike Supervalu's eleventh affirmative defense, which asserted non-liability on the ground that OOIDA "'ha[d] already been paid by shippers or others for any lumping[-]service costs incurred at Supervalu facilities during the applicable time period.'" The district court agreed with Supervalu's reading of § 14103(a)'s plain language. The district court concluded that its interpretation of the statute might be burdensome to drivers like OOIDA "but is not absurd." The district court ruled in its order that, "[t]o prove that Supervalu violated § 14103(a), [OOIDA] must show that neither a receiver nor a shipper paid a driver for lumping service costs incurred at Supervalu." The district court accompanied this rule with the following footnote:

> Under the court's interpretation, plaintiffs must prove as an element of the offense that neither the shipper nor receiver paid for the lumping costs. It is therefore improper to characterize this as an affirmative defense, but there is nevertheless no reason to strike it.

Finally, the district court granted summary judgment to Supervalu as to its second counterclaim, which sought declaratory judgment that § 14103(a) did not afford OOIDA a right to monetary relief. Again, relying on the statute's plain language, the district court found "no statute explicitly authoriz[ing] restitution as a remedy for an alleged violation of § 14103 against a receiver of property," and consequently "determine[d] that if 'Congress wished to provide a private damages remedy, it knew how to do so and [would have done] so expressly.'" Moreover, the trial court rejected OOIDA's contention that Congress, in employing the phrase "injunctive relief," necessarily evoked the broad equity jurisdiction of district courts.

On March 24, 2009, the district court resolved the parties' second round of cross-motions for summary judgment. Relevant to this appeal, the district court disposed of OOIDA's claims under § 14103(a). The district court granted summary judgment to Supervalu as to (1) its counterclaim for declaratory judgment that it did not violate § 14103(a) and, correspondingly, (2) OOIDA's affirmative claim for injunctive relief under § 14103(a). As the basis for its ruling, the district court found that "plaintiffs have not presented more than a 'scintilla' of evidence that drivers were not reimbursed for lumping services at Supervalu docks." Having found OOIDA's evidence to be wholly insufficient on this element, the district court made no mention of whether Supervalu's insurance requirement was reasonable.

OOIDA and Supervalu settled all remaining claims, subject to OOIDA retaining its right to appeal some of the district court's pretrial orders. OOIDA timely appealed and now alleges that the district court erred in three respects when construing §§ 14103(a) and 14704(a)(1): (1) in reading § 14103(a) to require OOIDA to prove as part of its prima facie case that it was not reimbursed by a shipper; (2) in ruling that Supervalu's insurance requirement could be construed as effectively mandating OOIDA to purchase lumping only if the requirement called for "unreasonable" amounts of coverage; and (3) in reading § 14704(a)(1)'s provision for "injunctive

relief" to authorize only injunctions, and not other equitable forms of monetary relief such as "restitution" or "accountings and disgorgement."

## II. *Discussion*

OOIDA urges this court to read 49 U.S.C. § 14103(a) as "impos[ing] an unqualified duty on receivers like Supervalu to provide delivery persons with compensation where those receivers require the delivery persons to obtain unloading services." Specifically, OOIDA maintains that "third[-]party reimbursement" like the kind its drivers received from their respective shippers "is irrelevant to a receiver's duty to compensate under Section 14103(a)." OOIDA cites no case law or legislative history to support this interpretation but states simply that it is "[t]he simplest and least burdensome interpretation of the statute." Additionally, OOIDA offers the public policy argument that the district court's contrary construction "turns Section 14103(a) into a statute that only provides relief to delivery persons through litigation and deprives them of the day-to-day benefits that the statute contemplates." "We review de novo the district court's grant of summary judgment, as well as the district court's interpretation of . . . a federal statute." *Jessep v. Jacobson Transp. Co., Inc.*, 350 F.3d 739, 741–42 (8th Cir. 2003).

## 1. *Section 14103(a)'s Plain Language*

Whether, under § 14103(a), the shipper or receiver reimbursing a trucker's lumping fees must be the same shipper or receiver who originally required the lumping is a question of first impression. Still, as with any question of statutory interpretation, the court begins its analysis with the plain language of the statute, *United States v. I.L.*, 614 F.3d 817, 820 (8th Cir. 2010). As we recently noted, "[t]he Supreme Court has 'stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there.'" *Id.* (quoting in part *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992)). "When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'" *Id.* (quoting in part *Germain*, 503 U.S. at 254).

Here, § 14103(a) provides in pertinent part that, "[w]henever a shipper or receiver of property requires that any person who owns or operates a motor vehicle . . . be assisted in the loading or unloading of such vehicle, the shipper *or* receiver shall be responsible for providing such assistance or shall compensate the owner or operator" for the costs thereof. 49 U.S.C. § 14103(a) (emphasis added). The district court concluded that this plain language—particularly the disjunctive "or" situated between "shipper" and "receiver"—when read literally, confirms that the shipper *or* receiver reimbursing a trucker's lumping fees need not be the same shipper or receiver who required the trucker to incur them. Thus, under the district court's reading, § 14103(a)'s plain language allows for either the shipper or the receiver to reimburse the trucker, irrespective of who required the trucker to purchase lumping services. Based on this reading of § 14103(a), the district court ruled as a matter of law that a plaintiff trucker suing under the provision had to show as part of his or her prima facie case that she had not been reimbursed by *either* the shipper *or* the receiver. In turn, applying this rule of law to OOIDA's case, the district court granted summary judgment against OOIDA because it failed to identify any of its truckers whom a shipper had not already reimbursed.

The district court erred in concluding that § 14103(a)'s plain language is unambiguous. A particular statutory provision is ambiguous when, *inter alia*, it is susceptible to more than one reasonable interpretation. *See Chickasaw Nation v. United States*, 534 U.S. 84, 90 (2001) (defining "ambiguity," in the statutory-construction context, as "capable of being understood in two or more possible senses or ways" (quoting Webster's Ninth New Collegiate Dictionary 77 (1985))). Here, § 14103(a) is susceptible to two reasonable interpretations. The district court's reading endeavors to give full effect to the disjunctive "or" and thereby renders the provision satisfied when either the shipper or the receiver reimburses the trucker for lumping. This construction of § 14103(a) is reasonable. Likewise, however, a reading of § 14103(a) that gives full effect to the definite article "the," in the phrase, "*the* shipper or receiver shall be responsible for providing such assistance or shall compensate the

owner or operator," yields a similarly reasonable construction that the shipper or receiver who required the lumping must either provide the lumping or pay for it. "In determining whether statutory language is plain and unambiguous, the court must read all parts of the statute together and give full effect to each part." *Estate of Farnham v. Comm'n of Internal Revenue*, 583 F.3d 581, 584 (8th Cir. 2009). Accordingly, when the court gives full effect to both the disjunctive conjunction, "or," in the phrase "shipper or receiver," and the definite article, "the," preceding that same phrase," two alternatively reasonable interpretations result. Thus, § 14103(a)'s language is ambiguous. Given this ambiguity, we "may examine legislative history and other authorities to determine [Congress's] legislative intent" behind the provision. *Estate of Farnham*, 583 F.3d at 584.

## 2. *Section 14103(a)'s Legislative History*

We again stress that, "[in the usual case, if 'the statute's language is plain, the sole function of the courts is to enforce it according to its terms,' without reference to its legislative history." *Owner-Operator Index. Drivers Ass'n v. United Van Lines, LLC,* 556 F.3d 690, 693 (8th Cir. 2009) (quoting *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989) and construing § 14704(a)(2)). This court, when interpreting this very statute, has explained that "[t]his rule 'results from deference to the supremacy of the Legislature, as well as recognition that Congressmen typically vote on the language of a bill.'" *Id.* (quoting *Lamie v. U.S. Tr.*, 540 U.S. 526, 538 (2004)). Thus, "[w]here the plain meaning of a statute is clear, 'we are not free to replace it with an unenacted legislative intent.'" *Id.* (quoting in part *INS v. Cardoza Fonseca*, 480 U.S. 421, 453 (1987) (Scalia, J., concurring)). However, if the statute's language is not plain but instead ambiguous, we may resort to legislative history and any other authorities that might facilitate our efforts to discern Congress's intent behind the particular statutory provision in question. *Estate of Farnham*, 583 F.3d at 584. Moreover, in those "'rare cases' when a statute's plain text produces a result 'demonstrably at odds with the intentions of its drafters, . . . those intentions must be

controlling.'" *United Van Lines, LLC*, 556 F.3d at 694 (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571 (1982)).

Section 14103(a) is part of the revised version of the Motor Carrier Act, to which we hereinafter refer to as, "MCA-II," though it is properly called the Interstate Commerce Commission (ICC) Termination Act. MCA-II evolved from the first Motor Carrier Act of 1980 [hereinafter MCA-I]. Act of July 1, 1980, ch. 111, § 15, 94 Stat. 793, 808, *repealed by* ICC Termination Act of 1995 [hereinafter ICC Termination Act], Title I, § 103, 109 Stat. 803, 891. Indeed, MCA-II's lumping section—the provision at issue in this case—is a virtually verbatim iteration of MCA-I's.[5] In 1980, MCA-I was spawned out of Senate Bill 2245 ("S. 2245") and House Bill 6418 ("H.R.

---

[5]*Compare* Motor Carrier Act of 1980 (MCA-I), ch. 111, § 15, 94 Stat. 793, 808, *repealed by* ICC Termination Act of 1995, Title I, § 103, 109 Stat. 803, 891.

> (a)     Whenever a shipper or receiver of property requires that any person who owns or operates a motor vehicle transporting property in interstate commerce (whether or not such transportation is subject to the jurisdiction of the Commission under subchapter II of chapter 105 of this title) be assisted in the loading or unloading of such vehicle, the shipper or receiver shall be responsible for providing such assistance or shall compensate the owner or operator for all costs associated with securing and compensating the person or persons providing such assistance.

*with* 49 U.S.C. § 14103(a)

> (a)     Whenever a shipper or receiver of property requires that any person who owns or operates a motor vehicle transporting property in interstate commerce (whether or not such transportation is subject to jurisdiction under subchapter I of chapter 135) be assisted in the loading or unloading of such vehicle, the shipper or receiver shall be responsible for providing such assistance or shall compensate the owner or operator for all costs associated with securing and compensating the person or persons providing such assistance.

6418"), with Congress technically passing S. 2245 in lieu of H.R. 6418, but pursuant to an agreement between both chambers amending the Senate bill to contain the text of the House bill. H.R. Rep. No. 96-1069, at 1 (1980), *reprinted in* 1980 U.S.C.C.A.N. 2283, 2283. As stated in the Report authored by the House Committee on Public Works and Transportation—the authoritative report given that the Senate amended its own bill to contain the House language—"the purpose of the Motor Carrier Act of 1980 [wa]s to reduce unnecessary regulation by the Federal Government." *Id.* at 10, *reprinted in* 1980 U.S.C.C.A.N. at 2292. Commensurate with this general theme of deregulation, the Committee stated with specific regard to Section 15—the section concerning lumping—the following:

> Under the circumstances, it may be difficult for the trucker to prove that the shipper, broker, or receiver agreed to repay the trucker for any expenses incurred in the loading or unloading of his truck. . . .
>
> In order to promote a system which will preclude the use of force or coercion at loading docks, new section 11109(a) of title 49 establishes guidelines for who should load and unload the trucks. *The purpose of this provision is not to suggest or endorse any particular apportionment of loading or unloading responsibilities between and among shippers, receivers, carriers, and owner-operators. In fact, it is the Committee's belief that this apportionment of responsibility is a market decision to be determined by the parties to the transaction . . . .*
>
> [W]here an owner-operator is leased to a regulated carrier, the Committee expects the lease to specify the responsibilities of the carrier and owner-operator regarding loading and unloading, *including compensation*.

*Id.* at 30–31, *reprinted in* 1980 U.S.C.C.A.N. at 2312–13 (emphasis added).

OOIDA "suppose[s]" in its brief "that shippers, receivers[,] and freight brokers may agree among themselves who must bear the burden of those [unloading] costs,"

-11-

but, indeed, its supposition appears to have been Congress's precise intention when it promulgated MCA-I. This conclusion is further bolstered by the floor statements of Representative James J. Howard, then-chairman of the Committee's Surface Transportation Subcommittee. In those statements, which he made immediately preceding the third and final reading of MCA-I, just before its passage by the House, Representative Howard advised the general body that the Committee had amended the lumping sections once more to prevent broader-than-intended interpretations:

> Following the Committee markup, many suggested that the"words" in section 15 [(the lumping section)] could be construed in a much broader manner than intended by the Committee. These amendments to sections 15 and 16 are intended to eliminate any question as to the Committee's intent.
>
> Let me say that the Committee's original intent was (1) to eliminate extortionate practices that occur on the docks, (2) to ensure that clear notice is given to owner-operators when they are responsible for loading and unloading their trucks, (3) to identify any compensation that the owner-operator is to receive for such loading or unloading, and (4) to ensure that any compensation provided for is received by the owner-operator. These amendments convey this intent in a more clear manner than does the bill as reported.

126 Cong. Rec. 15643 (1980) (statement by Rep. Howard). Representative Howard's statements emphasize that Congress's focus in enacting MCA-I's lumping provisions was on *ex ante* notice of reimbursement responsibilities, not on assigning those responsibilities to any particular party to the trucking transaction.

Fifteen years later, in 1995, Congress enacted the ICC Termination Act, dissolving the ICC, along with much of its regulatory framework, and transferring any surviving regulatory obligations to the newly formed Department of Transportation (DOT). ICC Termination Act of 1995, Pub. L. No. 104-88, 109 Stat. 803 [codified at 49 U.S.C. § 13101 *et seq.*]. The ICC Termination Act included provisions for the

newly revised MCA-II. Much like the legislative process producing its predecessor, MCA-II arose out of two bills, House Bill 2539 ("H.R. 2539") and Senate Bill 1396 ("S. 1396"), with H.R. 2539 being passed in lieu of its Senate counterpart, pursuant to an agreement between both houses. H.R. Rep. No. 104-422, at 165 (1995), *reprinted in* 1995 U.S.C.C.A.N. 793, 850 (Conf. Rep.). Most of the legislative history is contained in a House report authored by the House Transportation and Infrastructure Committee (the House Committee on Transportation and Public Works's successor). *See* H.R. Rep. No. 104-311 (1995), *reprinted in* 1995 U.S.C.C.A.N. 793. Summarizing H.R. 2539's motor carrier provisions, the Committee wrote that "H.R. 2539 eliminates and then reenacts a revised Motor Carrier Act . . . eliminat[ing] numerous unnecessary provisions and streamlin[ing] many other of the ICC's functions regarding the regulation of the motor carrier industry." *Id.* at 84, *reprinted in* 1995 U.S.C.C.A.N. at 796. The Committee went on to declare that "H.R. 2539 is another important step in a 15-year effort to deregulation [sic] the motor carrier industry." *Id.* at 91, *reprinted in* 1995 U.S.C.C.A.N. at 803; *accord* 141 Cong. Rec. 38235 (1995) (statement by Sen. Hollings) ("With this bipartisan bill, the Congress will have completed the work begun with the Motor Carrier Act of 1980, to free the surface transportation industry from unnecessary and outmoded regulation.").

Concerning current § 14103 and lumping, the Committee stated, that "[t]his section *preserves current law regarding 'lumping'* (the utilization of other persons to load or unload freight from a truck) in the trucking industry," and "direct[ed] that upon transfer, DOT should not continue any dispute resolution functions regarding these rules, but rather only oversee the regulations." H.R. Rep. No. 104-311, at 117 (1995), *reprinted in* 1995 U.S.C.C.A.N. 793, 829 (emphasis added). Moreover, when the Senate-House Conference Committee convened to reconcile H.R. 2539 and S. 1396, that Committee noted that both bills's lumping versions were "identical," and the Conference simply adopted the House version. H.R. Rep. No. 104-422, at 215 (1995), *reprinted in* 1995 U.S.C.C.A.N. 850, 900 (Conf. Rep.). The only "current law" which these committees could have envisioned themselves preserving was the lumping

provisions of MCA I, and indeed, as already noted, MCA II's lumping provisions found in § 14103(a) are virtually identical. *See supra* n.5. Finally, that Congress envisioned lumping, as well as compensation therefor, to be decided by private contract is also reflected in other MCA-II provisions and the enabling regulations that Congress authorized DOT to promulgate. Indeed, we have noted that "[r]elated statutes" governing trucking equipment lease agreements "clarify that carriers and drivers are expected to enter into contractual agreements as to who will be responsible for unloading freight." *Jessep*, 350 F.3d at 742 (citing, *inter alia*, 49 U.S.C. § 14102(b)); *see* 49 U.S.C. § 14102(b) ("any arrangement, between a motor carrier . . . and any other person, under which such other person is to provide any portion of such transportation by a motor vehicle not owned by the carrier shall specify, in writing, who is responsible for loading and unloading the property onto and from the motor vehicle"). Similarly, DOT regulations enabling these related statutes mandate that "[the lease shall clearly specify who is responsible for loading and unloading the property onto and from the motor vehicle, and the compensation, if any, to be paid for this service." 49 C.F.R. § 376.12(e).

In sum, MCA-I's more extensive legislative history reveals Congress's legislative purpose behind MCA-II and § 14103(a): to curtail coercive and extortionate lumping practices by inducing shippers, receivers, and truckers to freely negotiate lumping among themselves in pre-delivery contracts. *See Jessep*, 350 F.3d at 742 (observing that MCA-I's "legislative history indicates section 14103 was meant to prohibit coercive and extortionate practices"). Congress did not intend § 14103(a) to impose on any particular party an unqualified duty to reimburse incurred lumping fees. And, as we have recognized, "[t]he goal of statutory analysis, of course, is to give effect to the Congressional intent behind the statute's enactment." *Estate of Farnham*, 583 F.3d at 584 (citing *Chevron USA, Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984)).

Returning to the facts of OOIDA's case, the district court, despite proceeding from the faulty first premise that § 14103(a)'s language is plain and unambiguous, ultimately arrived at the correct legal conclusion that a plaintiff trucker suing under the provision must show as part of his prima facie case that he has not been reimbursed by *either* the shipper *or* the receiver. In turn, applying this construction of § 14103(a) to OOIDA's case, the district court properly granted summary judgment against OOIDA because OOIDA failed to identify any of its truckers whom a shipper had not already reimbursed. Likewise, this court, finding the record to be devoid of any evidence that an OOIDA trucker was not reimbursed his or her lumping fees by a shipper, concludes that the district court properly disposed of OOIDA's suit under Rule 56. Finally, and in light of this conclusion, we need not address the remaining issues of (1) whether Supervalu's insurance requirement constituted a de facto requirement that OOIDA truckers purchase lumping; or (2) whether 49 U.S.C. § 14704(a)(1)'s provision for "injunctive relief" authorizes only injunctions for violations of § 14103(a), and not additional equitable remedies including "restitution" or "accountings and disgorgement."

## III. *Conclusion*

Having concluded that the district court properly read 49 U.S.C. § 14103(a) to preclude relief for un-reimbursed lumping absent a plaintiff-trucker's affirmative showing that he or she was not reimbursed by either the shipper or the receiver, we affirm.

COLLOTON, Circuit Judge, concurring in the judgment.

This case involves a dispute over a provision of the ICC Termination Act of 1995 that governs the loading and unloading of property transported in interstate commerce. *See* 49 U.S.C. § 14103. As the case comes to us, the district court assumed for the sake of analysis that Supervalu, Inc., required that owner-operators of motor vehicles who delivered goods to Supervalu's distribution centers be assisted

by so-called "lumpers" in the unloading of their vehicles. The court nonetheless rejected the claims of the Owner-Operator Independent Drivers Association, Inc. ("OOIDA") that its owner-operators were entitled to compensation from Supervalu for the costs of that assistance. To prevail on this appeal, OOIDA must establish both that Supervalu would be responsible for compensating owner-operators for the costs of lumpers required by Supervalu, and that OOIDA may be entitled to monetary relief. In my view, the governing statute provides that if a receiver requires owner-operators to use the assistance of lumpers, then that receiver is required to compensate the owner-operators for the costs of the assistance. The statute, however, does not authorize an award of monetary relief in a private civil action. On that basis, I concur in the judgment affirming the dismissal of OOIDA's claim.

I.

The statute at issue provides:

> Whenever a shipper or receiver of property requires that any person who owns or operates a motor vehicle transporting property in interstate commerce . . . be assisted in the loading or unloading of such vehicle, the shipper or receiver shall be responsible for providing such assistance or shall compensate the owner or operator for all costs associated with securing and compensating the person or persons providing such assistance.

49 U.S.C. § 14103(a).

Here, the district court assumed that a shipper or receiver – in this case, a receiver, Supervalu – required that owner-operators be assisted in the unloading of their vehicles. In that event, the statute requires that "the shipper or receiver shall be responsible" for compensating the owner-operator.

-16-

The text and structure of the statute lead to the conclusion that where a receiver requires the use of lumpers, that same receiver is responsible for compensating the owner-operator for the associated costs. The statute uses the definite article – "*the* shipper or receiver*" – when identifying the party responsible for compensating the owner-operators in the second clause. This means that the second clause refers to someone specific. *See Flandreau Santee Sioux Tribe v. United States*, 197 F.3d 949, 952 (8th Cir. 1999). It also raises an inference that the definite article refers back to a specific party previously identified – in this instance, whoever imposed the requirement to use lumpers under the first clause. *See United States v. Wilcox*, 487 F.3d 1163, 1176 (8th Cir. 2007); *Yamaha Corp. v. ESS Tech., Inc.*, No. 95-1362, 1996 WL 146499, at *3 (Fed. Cir. March 29, 1996); *Nat'l Foods, Inc. v. Rubin*, 936 F.2d 656, 660 (2d Cir. 1991). The term "or" in the second clause is necessary to allow the court to identify the responsible party, depending on which party imposed the requirement under the first clause. But the reference to "the shipper *or* receiver" in the second clause does not mean that the responsible party is indeterminate. Where a receiver has required the use of lumpers under the first clause, the more natural reading is that the definite article in the second clause refers to that specific receiver, not to a shipper, because no specific shipper has been identified by the preceding text.

A contrary interpretation would frustrate the statutory design. Section 14704(a)(1) provides that a person may bring a civil action for injunctive relief for violations of § 14103; in addition, § 14905 authorizes civil penalties of up to $10,000 against any person who knowingly violates § 14103(a). To give these provisions effect, § 14103(a) must designate a responsible party. If the statute means that *either* a shipper *or* a receiver is responsible for compensating an owner-operator, but never specifies which of the two is responsible, then it would be impractical for a court to award injunctive relief or to impose civil penalties.

The legislative history described by the court's opinion does not dictate a different conclusion. The 1980 Report of the House Committee on Public Works and

-17-

Transportation, H.R. Rep. No. 96-1069 (1980), is a tenuous basis for concluding that § 14103(a) fixes no responsibility for compensating an owner-operator. In addition to the usual concerns about the weight to be given legislative history, the specific bill that was discussed in the 1980 committee report did not become law, as it was substantially redrafted and amended on the floor of the House. *See* 126 Cong. Rec. 15,641-44 (1980) (setting forth amendments offered by Rep. Howard). The 1980 House report, moreover, commented on proceedings that led to a former statute, the Motor Carrier Act of 1980, Pub. L. No. 96-296, 94 Stat. 793. Although Congress reenacted the relevant provision without significant change in 1995, *see* ICC Termination Act of 1995, Pub. L. No. 104-88, § 103, 109 Stat. 803, 891, there was no settled judicial interpretation of the provision that became § 14103(a), *cf. Bragdon v. Abbott*, 524 U.S. 624, 645 (1998), and no reason to assume that Members of Congress in 1995 acted based on a passage in a House committee report from 1980.

In any event, even assuming the 1980 House report regarding proposed legislation should inform our interpretation of the 1995 statute, the report does not contradict the better reading of § 14103(a). As reported by the 1980 House committee, the bill *did* assign responsibility to a receiver of property to pay persons to unload such property, unless a tariff or written contract provided otherwise. *See* 126 Cong. Rec. 15,600 (1980) (setting forth proposed 49 U.S.C. § 11109(a)).[6]

---

[6]The proposed text reads as follows:

(1) A person shipping property which is transported by motor vehicle for compensation in interstate commerce . . . shall load such property onto such vehicle or shall employ or pay one or more persons . . . to load such property onto such vehicle, unless a tariff relating to such transportation of, or a written contract relating to such transportation entered into by, the person providing such transportation provides otherwise.

(2) A person receiving property which is transported by motor vehicle for compensation in interstate commerce . . . shall unload such property

Therefore, the committee report's statement that the apportionment of responsibility for loading or unloading "is a market decision to be determined by the parties to the transaction," H.R. Rep. No. 96-1069, at 31, contemplated a statutory assignment of responsibility in the absence of tariff or contract. The floor statement of Representative Howard, 126 Cong. Rec. 15,643 (1980), that the committee intended to "identify any compensation that the owner-operator is to receive" for loading or unloading is consistent with this framework. Under § 14103(a) as enacted in 1995, the parties likewise can apportion responsibility through tariff or contract, although such market activity must occur against the backdrop of a statute that otherwise fixes responsibility for compensating the owner-operator on the party requiring the use of lumpers.

For these reasons, if a receiver requires an owner-operator to be assisted in unloading a motor vehicle, then the receiver is responsible for providing such assistance or compensating the owner-operator. The district court's contrary conclusion should not be adopted.

## II.

The district court's judgment nonetheless may be affirmed on an alternative ground. In the settlement agreement between the parties, the owner-operators reserved their right to appeal the dismissal of their claim for restitution under § 14103(a), but not their claims for declaratory or injunctive relief under § 14103(a) or any of their claims under § 14103(b). Thus, the only remaining claim of the owner-operators seeks restitution from Supervalu for the costs associated with using lumpers

from such vehicle or shall employ or pay one or more persons . . . to unload such property from such vehicle, unless a tariff relating to such transportation of, or a written contract relating to such transportation of, or a written contract relating to such transportation entered into by, the person providing such transportation provides otherwise.

-19-

to unload goods.  The district court concluded that restitution is not an available remedy under the governing statutes.  If that conclusion is correct, then dismissal of the remaining claim was appropriate.

The provision that sets forth remedies available in a private action alleging violations of § 14103(a) is 49 U.S.C. § 14704.   Section 14704(a)(1) provides for relief in a private civil action: "A person may bring a civil action for injunctive relief for violations of sections 14102 and 14103."   Section 14704(a)(2) provides for damages in private actions, *see OOIDA, Inc. v New Prime*, 192 F.3d 778, 785 (8th Cir. 1999), but only for violations by a "carrier or broker providing transportation or service," not by a shipper or receiver.  *See* 49 U.S.C. § 13102 (defining "carrier" and "broker").  Another provision, 49 U.S.C. § 14905(a), allows for a civil penalty of up to $10,000 per violation of § 14103, payable to the United States.

The owner-operators contend that § 14704(a)(1), though it refers only to "injunctive relief," authorizes a district court to grant all forms of equitable relief, including restitution and disgorgement.  They cite the Supreme Court's statement in *Mitchell v. Robert De Mario Jewelry, Inc.*, 361 U.S. 288, 291 (1960), and *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946), that "[u]nless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied."  *Porter* held that a statute providing for injunctive relief "or other order" authorized a court to order restitution.  328 U.S. at 399.  *Mitchell* went further, holding that a statute granting district courts jurisdiction "to restrain violations of section 15" of the Fair Labor Standards Act authorized a district court, in an action brought by the Secretary of Labor, to award reimbursement for wages that were lost due to unlawful discharge or discrimination.  361 U.S. at 289, 296.  According to *Mitchell*, the "affirmative confirmation of the power to order reimbursement" that appeared in *Porter* – through the statute's reference to "a permanent or temporary injunction, restraining order, *or other order*" – was unnecessary to establish "the full scope" of the district court's

-20-

equity jurisdiction. *Id*. at 291 (internal quotation omitted); *see Porter*, 328 U.S. at 399.

More recently, however, the Court has emphasized that where Congress expressly designates a particular remedy, "a court must be chary of reading others into it." *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 488 (1996) (internal quotation omitted). This is especially so when Congress "has provided 'elaborate enforcement provisions' for remedying the violation of a federal statute." *Id.* at 487-88 (quoting *Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 14 (1981)).

In the context of interstate transportation of property by motor vehicle carrier, Congress permitted civil monetary penalties for violations of § 14103 in an action brought by the United States; it provided for damages in a private action brought against a "carrier or broker"; but it authorized only "injunctive relief" in a private action against a shipper or receiver premised on a violation of § 14103. "Injunctive relief" is a distinct type of equitable relief that does not encompass restitution or disgorgement. *See Mertens v. Hewitt Assocs.*, 508 U.S. 248, 256 (1993). Whether to infer the availability of *all* forms of equitable relief based on the authorization of one form depends on the statutory scheme.

The better view here is that restitution and disgorgement are not available forms of relief in an action against a receiver for a violation of § 14103. Congress established a detailed remedial scheme in Chapters 147 and 149 of Title 49. While the statute provides for monetary relief in other contexts, it does not designate such a remedy in a private action for a violation of § 14103. Unlike this case and *Meghrig*, the Supreme Court's decisions in *Porter* and *Mitchell* both involved public enforcement actions, and the Court explained that a court's equitable powers "assume an even broader and more flexible character" in that context "than when only a private controversy is at stake." *Porter*, 382 U.S. at 398; *see also United States v. Lane Labs-USA Inc.*, 427 F.3d 219, 231 (3d Cir. 2005); *FTC v. Sec. Rare Coin & Bullion Corp.*,

931 F.2d 1312, 1314 (8th Cir. 1991). In light of the Supreme Court's most recent direction to be cautious in private actions about supplementing the remedies that are expressly authorized by Congress, the prudent conclusion is that monetary remedies are impliedly excluded in a private action under § 14704(a)(1) based on an alleged violation of § 14103. Consistent with the Ninth and Eleventh Circuits, therefore, I agree with the district court that the owner-operators are not entitled to restitution. *See OOIDA, Inc. v. Swift Transp. Co.*, 632 F.3d 1111, 1121 (9th Cir. 2011); *OOIDA, Inc. v. Landstar Sys., Inc.*, 622 F.3d 1307, 1323-24 (11th Cir. 2010).

For these reasons, I concur in the judgment affirming the district court's dismissal of the owner-operators' claim for restitution under 49 U.S.C. §§ 14103(a) and 14704(a)(1).

_____