# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued October 20, 2016          Decided November 29, 2016

No. 15-1156

AMERICAN POSTAL WORKERS UNION, AFL-CIO,
PETITIONER

v.

POSTAL REGULATORY COMMISSION,
RESPONDENT

UNITED STATES POSTAL SERVICE,
INTERVENOR

———

On Petition for Review of an Order
of the Postal Regulatory Commission

———

*Michael T. Anderson* argued the cause for petitioner. With him on the brief were *Lorrie E. Bradley* and *Jeremiah Fugit.*

*Jeffrey E. Sandberg*, Attorney, U.S. Department of Justice, argued the cause for respondent. With him on the brief were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, *Michael S. Raab*, Attorney, *David A. Trissell*, General Counsel, Postal Regulatory Commission, and *Christopher Laver*, Deputy General Counsel.

Before: WILKINS, *Circuit Judge*, and EDWARDS and WILLIAMS, *Senior Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

WILKINS, Circuit Judge:   The American Postal Workers Union (the "Union") petitions this Court for review of the Postal Regulatory Commission's ("PRC") denial of its December 13, 2013 amended complaint. In its amended complaint, the Union alleged that the United States Postal Service failed to comply with First-Class Mail service standards. *See* Am. Compl. ¶ 20. Upon review, the PRC dismissed the Union's amended complaint for three reasons. First, the PRC explained that the service standards set forth in 39 C.F.R. § 121.1 are service "expectations" and not service "requirements." U.S. Postal Regulatory Comm'n, Order No. 2512, Order Granting Motion for Reconsideration and Granting Motion to Dismiss 9 (May 27, 2015) [hereinafter PRC Order No. 2512]; *see id.* at 14. Second, the PRC ruled it remedied the Postal Service's noncompliance when it instructed the Postal Service to improve service compliance in the Annual Compliance Determination. *Id.* at 17-20. Third, the PRC noted that the Union's amended complaint failed to raise new or material issues of fact or law. *Id.* at 13-17. For the following reasons, we deny the Union's petition.

**I.**

In 2006, Congress enacted the Postal Accountability and Enhancement Act ("PAEA") to reform postal operations and mitigate the U.S. Postal Service's financial difficulties. *See* Postal Accountability & Enhancement Act, Pub. L. No. 109-435, 120 Stat. 3198 (2006). Congress concluded that the Postal Service maintained more facilities than economically necessary, and instructed the Postal Service to devise a

strategy for eliminating excess processing capacity. *Id.* § 302(c)(1)(B), 120 Stat. at 3219. As part of this mandate, Congress created the PRC to ensure postal accountability and oversee postal functions and facility reductions. *See* 39 U.S.C. § 501.

The PAEA required the Postal Service to establish a set of service standards for market-dominant products, including First-Class Mail. *Id.* § 3691(a). These standards must be devised in conjunction with the PRC, and serve as enforceable benchmarks published in the Code of Federal Regulations. *Id.*; *see also* U.S. Postal Regulatory Comm'n, Order No. 465, Order Establishing Final Rules Concerning Periodic Reporting of Service Performance Measurements and Customer Satisfaction 5 (May 25, 2010). The service standards are designed to achieve the general policy goals of mail reliability and speed, and specify the amount of time within which a customer may ordinarily expect his mail to be delivered. 39 U.S.C. § 3691(b)(1). The Postal Service promulgated its initial service standards in 2007, and has revised those standards periodically. *Id.* § 3691(a).

As relevant to this case, the Postal Service issued a final rule on May 25, 2012, altering its existing service standards in conjunction with the Mail Processing Network Rationalization ("MPNR") initiative. The MPNR initiative proposed closing more than 229 mail processing facilities in two phases for a forecasted net savings of $2.1 billion. *See* U.S. Postal Regulatory Comm'n, No. N2012-1, Advisory Opinion on Mail Processing Network Rationalization Changes 1, 28, 46 (Sept. 28, 2012) [hereinafter MPNR Advisory Opinion]; *see generally* Revised Service Standards for Market-Dominant Mail Products, 77 Fed. Reg. 31,190, 31,191-92 (May 25, 2012). During Phase 1, which was scheduled to last from July 1, 2012 through February 2013,

the Postal Service proposed closing approximately 140 plants. 77 Fed. Reg. at 31,192; MPNR Advisory Opinion, *supra*, at 46. Phase 2, which would result in the closure of the remaining plants, was scheduled to begin in February 2014. 77 Fed. Reg. at 31,192; MPNR Advisory Opinion, *supra*, at 46. The post-February 2014 service standards for First-Class Mail are summarized as follows: [1]

- **Overnight Mail:** An overnight service standard will be applied to intra-Sectional Center Facility ("SCF") domestic Presort First Class Mail pieces properly accepted at the SCF before the day-zero Critical Entry Time ("CET"). 77 Fed. Reg. at 31,194. The overnight standard will no longer apply to mail sent by retail customers, regardless of location. *Id.*

- **Two-Day Mail:** A two-day service standard will be applied to all inter-SCF domestic First-Class Mail pieces that are properly accepted before the day-zero CET if the drive time between the origin Processing and Distribution Center or Facility and destination SCF is six hours or less. *Id.*

- **Three-, Four-, and Five-Day Mail:** The three-, four-, and five-day service standards remain unchanged. A three-day service standard will be applied to all domestic First-Class Mail pieces properly accepted

---

[1] The current service standards contained in 39 C.F.R. § 121.1 reference an effective date of January 2015. For purposes of this appeal, we are concerned with the service standards in effect during the MPNR initiative. An interim version of the service standards applied during Phase 1 of the MPNR initiative (from July 1, 2012 through January 31, 2014), and a final version of the service standards took effect on February 1, 2014. For simplicity, only the final service standards are detailed in this opinion.

before the day-zero CET if the overnight and two-day service standards do not apply and additional origin/destination criteria are satisfied. *Id.* at 31,194-95. A four-day service standard will apply to domestic First-Class Mail pieces properly accepted before the day-zero CET if the overnight, two-day, and three-day service standards do not apply and additional origin/destination criteria are satisfied. 39 C.F.R. § 121.1(d) (2014). A five-day service standard will apply to "all remaining domestic First-Class Mail pieces properly accepted before the day-zero CET." *Id.* § 121.1(e).

These new service standards shifted a substantial portion of mail previously subject to the overnight standard to either the two-, three-, four-, or five-day service standards, and further transferred a large volume of the two-day mail to the three-, four-, and five-day service standards. PRC Order No. 2512, *supra*, at 18; MPNR Advisory Opinion, *supra*, at 7; U.S. Postal Regulatory Comm'n, Annual Compliance Determination Report Fiscal Year 2013 105 (Mar. 27, 2014) [hereinafter ACD FY 2013].

The PAEA further directs the Postal Service to develop a "plan" for meeting its service standards, including the establishment of "performance goals" for mail delivery. PAEA § 302(a), (b)(1), 120 Stat. at 3219; *see also* U.S. Postal Serv., Postal Accountability and Enhancement Act § 302 Network Plan (June 2008), *available at* https://about.usps.com/postal-act-2006/postal-service-networkplan.pdf [hereinafter Network Plan]. In accordance with this directive, the Postal Service created a set of "performance targets" to track its success in meeting its service standards. *See* Network Plan, *supra*, at 7. For fiscal year 2013, the target on-time delivery rates were 96.7%,

95.1%, and 95.0% for mail subject to overnight, two-day, and three- to five-day service standards, respectively. U.S. Postal Regulatory Comm'n, Annual Compliance Determination Report Fiscal Year 2014 96 tbl. V-4 (Mar. 27, 2015) [hereinafter ACD FY 2014]. The targets increased for fiscal year 2014 to 96.8%, 96.5%, and 95.25% for mail subject to overnight, two-day, and three- to five-day service standards, respectively. *Id.*

To evaluate the Postal Service's compliance with its service standards, the PRC must issue an Annual Compliance Determination ("ACD") report for each fiscal year. *See* 39 U.S.C. § 3653(b). If the PRC finds noncompliance, it must take appropriate action to remedy the noncompliance. *Id.* § 3653(c). During Phase 1 of the MPNR initiative, the PRC concluded that First-Class Mail presorted letters and postcards met or exceeded all annual service performance targets for fiscal year 2013. ACD FY 2013, *supra*, at 99, 105. Comparably, First-Class Mail single-piece letters and postcards met or exceeded service performance goals for the overnight and two-day service targets, but did not reach the service performance targets for the three- to five-day mail category. *Id.* at 105. First-Class Mail flats and parcels, however, underperformed and failed to reach any of their on-time delivery performance goals for the third year in a row. *Id.* at 99, 104, 106-07.

The ACD results for fiscal year 2014 showed a continual decline in Postal Service performance. While First-Class Mail presorted letters and postcards subject to overnight or two-day service standards continued to meet their applicable service goals, all remaining First-Class Mail products failed to satisfy their service requirements, including: (1) single-piece letters and postcards subject to overnight, two-day, and three- to five-day delivery; (2) pre-sorted letters and postcards subject

to three- and five-day delivery; (3) flats; (4) parcels; (5) inbound letter post; and (6) outbound single-piece international letters. ACD FY 2014, *supra*, at 87-88 tbls. V-1, V-2. Although the decreased service performance occurred during Phase 2 of the MPNR initiative, the Postal Service linked its noncompliance to severe winter storms that plagued the first and second quarters of fiscal year 2014. *Id.* at 88. After reviewing the data, the PRC concluded that winter storms likely impacted service delivery times, but nonetheless cautioned that "weather cannot consistently be employed as a catchall excuse for failing to meet performance standards." *Id.* at 104. The PRC further instructed that it "expects service performance to improve in FY 2015." *Id.* Regarding First-Class Mail flats specifically, the PRC directed the Postal Service to "improve service for First-Class Mail Flats in FY 2015 or to provide an explanation in the FY 2015 [Annual Compliance Report] for why efforts to improve service performance results . . . have been ineffective and detail what changes it plans to make to improve service performance." *Id.*

Notwithstanding the PRC's responsibility to publish ACD reports, any interested person who believes the Postal Service is not operating in compliance with its regulatory or statutory requirements may file a complaint with the PRC. 39 U.S.C. § 3662(a). Within 90 days after receiving a complaint, the PRC must either issue an order dismissing the complaint, *id.* § 3662(b)(1)(A)(ii), or begin proceedings on any complaint that "raises material issues of fact or law," *id.* § 3662(b)(1)(A)(i). If the PRC finds a complaint to be justified after discovery and appropriate hearings, it shall order the Postal Service to "take such action as the Commission considers appropriate in order to achieve compliance with the applicable requirements and to remedy the effects of any noncompliance." *Id.* § 3662(c). In cases of deliberate noncompliance by the Postal Service, the PRC may

additionally require the Postal Service to pay a fine. *Id.* § 3662(d).

Given the dual remedies available through the ACD and complaint process, the Newspaper Association of America expressed concern several years ago that a finding of compliance or noncompliance in an ACD could moot a pending complaint on the same issue. U.S. Postal Regulatory Comm'n, Order No. 195, Order Establishing Rules for Complaints and Rate or Service Inquiries 21 (Mar. 24, 2009) [hereinafter Rules for Complaints]. The PRC responded by noting that Congress contemplated this exact issue and addressed it in the statute. *Id.* at 22. Specifically, section 3653(e) creates a rebuttable presumption of compliance by the Postal Service if the PRC issues a timely written determination of compliance in an ACD. 39 U.S.C. § 3653(e); *see* Rules for Complaints, *supra*, at 22-23. If Congress had wished for an ACD to render a complaint moot, it would have created a non-rebuttable presumption in section 3653(e). Rules for Complaints, *supra*, at 23. The dual enforcement scheme of ACD reports and complaints is necessary because ACD proceedings are completed in short, fixed timeframes and are not subject to the same opportunities for contesting evidence in adversarial proceedings. *Id.* Thus, "Commission findings in an annual compliance determination are relevant to a pending complaint proceeding, but are not necessarily dispositive of those issues." *Id.*

## II.

On September 5, 2013, the Union submitted a complaint to the PRC alleging that the Postal Service violated the requirements of 39 U.S.C. §§ 3661 and 3691. *See generally* Compl. ¶¶ 6-8, 21, 28. The Union amended its complaint on December 13, 2013. *See generally* Am. Compl. In particular,

the Union alleged that the Postal Service regularly failed to comply with its First-Class Mail service standards. *Id.* ¶ 20. This failure to comply with service standards was allegedly the direct result of the Postal Service's MPNR initiative. *Id.* ¶ 21. As a result, the Postal Service violated service standards on a nationwide basis and deprived individuals and business mailers of the service to which they are entitled under law. *See id.* ¶¶ 25-97. To support this theory, the Union provided a list of representative locations affected by the MPNR initiative where service standards were consistently violated. *See id.* ¶¶ 25-77. The Union further conducted a test mailing of forty letters from its office in Washington, D.C. to various Union members across the country. *Id.* ¶¶ 78-91. Twenty-five percent of these letters were not delivered in accordance with the service standards set forth in 39 C.F.R. § 121.1. *Id.* ¶ 79.

Upon review, the PRC initially dismissed the Union's amended complaint for lack of standing on February 27, 2014. *See* U.S. Postal Regulatory Comm'n, Order No. 2000, Order Dismissing Complaint (Feb. 27, 2014). Subsequently, on May 27, 2015, the PRC granted the Union's motion for reconsideration and vacated its earlier dismissal. *See* PRC Order No. 2512, *supra*, at 1, 5-8. Nonetheless, the PRC again dismissed the amended complaint, this time on the merits. Splitting 2-1, the PRC offered three primary bases for its decision. First, the PRC explained that the service standards set forth in 39 C.F.R. § 121.1 are service "expectations" not service "requirements." *Id.* at 9. While service standards play an important role in postal regulation, they "do not act as legal requirements" unless measured by reference to external performance goals. *Id.* at 10. Service standards themselves provide no guarantee of actual service, but rather only offer a description of expected mail delivery time. *Id.* Therefore, "the premise that a complaint lies based on failing to provide service in conformance with an expectation is misplaced." *Id.*

Second, the PRC noted that the Union's complaint failed to raise new or material issues of fact or law. *Id.* at 13. While the Union performed a limited mailing test to support its allegations, its results did not add any new information that was not already publicly known or addressed by the PRC. *Id.* at 16-17. The PRC was aware of the Postal Service's noncompliance with service standards and should not be required to expend limited resources reestablishing a known fact. *See id.* at 17; *see also id.* at 19-20 ("[A]fter an issue has been considered under [either an ACD or a complaint], in most instances reconsidering the same issue using the alternative approach is not a necessary or efficient use of resources."). Unlike the situation contemplated by Congress in which the PRC's finding of compliance serves only as a rebuttable presumption, the Union presented allegations entirely consistent with the PRC's findings. *Id.* at 20. Such consistency does not present a new issue of material fact.

Finally, the PRC noted that it already directed the Postal Service to take remedial action to ensure future compliance. *Id.* at 17. Given the unusual impact caused by winter storms, the PRC determined that the appropriate action was to "reiterate the Postal Service's responsibility to meet service performance goals." *Id.* at 19. Because the PRC may direct the same remedies for a finding of noncompliance under either an ACD or a complaint, the PRC ruled it is unlikely to award further relief for this instance of noncompliance. *See id.* at 19-20. Thus, the PRC dismissed the Union's amended complaint.

Commissioner Goldway, however, dissented from the majority opinion and argued that the Union's amended complaint was prematurely dismissed. *See* U.S. Postal Regulatory Comm'n, Order No. 2512, Dissenting Opinion of Commissioner Goldway 1-3 (May 27, 2015). The dissent

argued that the PRC previously observed that full effect would not be given to the statutory scheme if complaints could be rendered moot by issuance of an ACD report. *Id.* at 2. Accordingly, the Union should be afforded the opportunity to prove its case, and the majority's dismissal denies the Union a fair opportunity to engage in discovery and create a full record. *Id.* at 3. Because the PAEA "anticipate[d] a robust Complaint mechanism," Commissioner Goldway argued, the PRC's remedial authority is much broader than the majority described. *Id.* The PAEA intended for the ACD and complaint processes to work in tandem, not in a manner that is mutually exclusive. *Id.* Thus, the mere fact that the PRC has previously recognized service quality problems in its ACD reports should not bar a legitimate complaint. *Id.* at 1. The Union timely filed a petition for review in this Court on May 29, 2015.

**III.**

This case presents two primary questions. First, did the PRC reasonably determine that the Postal Service's compliance with regulatory standards is evaluated by reference to separately published service performance goals? We answer this question in the affirmative. Second, did the PRC act arbitrarily or capriciously by dismissing the Union's amended complaint for failure to raise a material issue of fact or law? We answer this question in the negative.

**A.**

This Court has jurisdiction to review the PRC's dismissal of a complaint pursuant to 39 U.S.C. § 3663. According to section 3663, any person adversely affected by a final order of the PRC may institute proceedings for judicial review of that order. 39 U.S.C. § 3663. The Court "shall review the order or decision in accordance with section 706 of title 5" based on the record before the PRC. *Id.* Section 706 of the

Administrative Procedure Act permits the Court to set aside agency action, findings, and conclusions if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see GameFly, Inc. v. Postal Regulatory Comm'n*, 704 F.3d 145, 148 (D.C. Cir. 2013). The scope of review under the arbitrary and capricious standard "is narrow" and the Court "is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S. Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). That said, the Court must be satisfied that the agency examined all relevant data and articulated a logical explanation for its decision, including a rational connection between the facts and ultimate outcome. *Id.* An agency rule may be considered arbitrary and capricious if the agency relied on factors which Congress did not intend it to consider or "offered an explanation for its decision that runs counter to the evidence before the agency." *Id.*

With regards to statutory interpretation, the Court follows the framework set forth in *Chevron U.S.A. Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 842-44 (1984). *See U.S. Postal Serv. v. Postal Regulatory Comm'n*, 640 F.3d 1263, 1266 (D.C. Cir. 2011) (noting that because Congress expressly delegated to the PRC responsibility to implement the PAEA, the PRC's interpretation is reviewable under *Chevron*). *Chevron* review involves a two-step analysis. First, if a statute is clear, the Court must give effect to Congress's unambiguous intent. *Chevron*, 467 U.S. at 842-43. Where ambiguity plagues a statute, the Court must turn to the second *Chevron* principle and give deference to the agency's reasonable interpretation of the statute. *Id.* at 843.

**B.**

The first issue we address is the PRC's interpretation of "service standards." The Union argues that the PRC erroneously interprets service standards as aspirational goals that lack the force of law. *See* Pet'r Br. 23-32. According to the Union, the PRC has conflated service standards with operational performance goals and implicitly authorized the Postal Service to underperform. *See id.* at 30-35. The Union, however, misconstrues the PRC's order. The PRC does not contend that service standards are legally unenforceable. Resp't Br. 33; *see generally* PRC Order No. 2512, *supra*, at 8-12 (highlighting that service standards are enforceable when assessed in conjunction with performance goals). Rather, the PRC maintains that whether the Postal Service has complied with its statutory requirements is evaluated by separately published service performance goals. Resp't Br. 33; *see* PRC Order No. 2512, *supra*, at 8-12 (explaining the interaction between service standards and performance goals). The PRC acknowledges that the service standards contained in 39 C.F.R. § 121.1 possess legal force. Resp't Br. 34. Thus, the issue before this Court is not whether service standards are legally enforceable – all parties agree they are – but whether the PRC's method for evaluating when those service standards have been violated (i.e., by examining external performance goals) is reasonable. We find that it is.

*First*, Congress has not directly addressed the issue of how Postal Service noncompliance should be calculated. Pursuant to the PAEA, the Postal Service must promulgate regulations that establish service standards for market-dominant products. 39 U.S.C. § 3691(a). In addition, the Postal Service is tasked with developing a plan for complying with service standards, which includes establishing "performance goals." PAEA § 302(a), (b)(1), 120 Stat. at

3219. The PAEA does not, however, contain any governing principle by which to distinguish compliance from noncompliance. Rather, by its silence, the PAEA commits to the PRC's discretion the development of legal benchmarks necessary for determining whether the Postal Service violated its service standards. Thus, given congressional silence on this issue, we proceed to *Chevron* step two.

*Second*, we find the PRC's interpretation that "service standards" should be measured in conjunction with separately defined performance goals reasonable and entitled to deference. The PAEA requires the Postal Service to establish a set of service *standards*, not service *guarantees*. *See* 39 U.S.C. § 3691(a). These standards must be designed to "reasonably assure Postal Service customers delivery reliability, speed and frequency." *Id.* § 3691(b)(1)(C). Such "reasonabl[e] assur[ance]" simply creates an "expectation" of on-time delivery without developing an enforceable right to sue over each-and-every piece of mail that arrives outside that delivery window. Therefore, when examining whether the Postal Service has complied with its service obligations, the PRC regularly analyzes the Postal Service's rate of on-time delivery performance in reference to separately published service performance goals.

This interpretation is reasonable given that nothing in the PAEA suggests that the Postal Service violates the law every time a piece of mail arrives outside the applicable time window set forth in 39 C.F.R. § 121.1. A small amount of mail will always fail to be delivered within its specified service standard. *See* Modern Service Standards for Market-Dominant Products, 72 Fed. Reg. 72,216, 72,220 (Dec. 19, 2007). This reality is the result of unpredictable weather conditions, high mail volume, unanticipated labor disputes, human error, and other workplace or regional events. The

PRC is aware of the logistical impossibility of ensuring timely delivery of each piece of mail and, therefore, determined that Postal Service compliance must be analyzed with reference to an external target. The Union's contentions to the contrary would subject the Postal Service to a flood of litigation each time a birthday card or letter was delivered late. Given the financial woes already plaguing the Postal Service, we cannot conclude that Congress intended such a result.

Further, if service standards could be violated on an envelope-by-envelope basis, it would be a foregone conclusion in every ACD that the Postal Service is in noncompliance with the statute. This result would eliminate any meaningful distinction between compliance and noncompliance. Rather than being subject to remedial directives only in years of noncompliance, the Postal Service would be forced to undertake remedial measures yearly. *See* 39 U.S.C. § 3653(c) ("If, for a year, a timely written determination of noncompliance is made under subsection (b), the Postal Regulatory Commission shall take appropriate action . . . ."). This contravenes the statutory structure, which clearly contemplates that the Postal Service can be found in compliance with its service standards. *See, e.g.*, *id.* § 3653(b) ("If, with respect to a year, no instance of noncompliance is found under this subsection to have occurred in such year, the written determination shall be to that effect."). A contrary result would frustrate congressional intent.

Similarly, nothing in the PAEA requires the Postal Service to disclose information to the PRC regarding the delivery outcome of every single piece of mail. The PAEA only mandates that the Postal Service provide the PRC with a report analyzing the "quality of service" in enough detail "to demonstrate that all products during such year complied with all applicable requirements" in Title 39. *Id.* § 3652(a)(1). The

information provided by the Postal Service must describe the level of service (i.e., speed of delivery and reliability) provided, but need not identify whether each individual item of mail achieved its on-time service performance standard. This supports the PRC's determination that compliance evaluations should occur in the aggregate.

Finally, the legislative history bolsters the PRC's interpretation. In 2004, Congress considered a legislative proposal in which the language corresponding to section 3691(b)(1)(C) would have required service standards to "*guarantee* Postal Service customers delivery reliability, speed and frequency consistent with reasonable rates and best business practices." S. 2468, 108th Cong. § 301 (2004) (emphasis added). A later version of the legislation, which was enacted, replaced the word "guarantee" with the phrase "reasonably assure," S. 662, 109th Cong. § 301 (2005), thus clarifying that service standards do not create binding on-time delivery requirements for each piece of mail. *See* 39 U.S.C. § 3691(b)(1)(C); *Chickasaw Nation v. United States*, 534 U.S. 84, 93 (2001) ("We ordinarily will not assume that Congress intended 'to enact statutory language that it has earlier discarded in favor of other language.'" (quoting *INS v. Cardoza-Fonseca*, 480 U.S. 421, 443 (1987))). In light of these factors, we hold that the PRC's interpretation of service standards is reasonable and entitled to deference.

## C.

The second question we must answer is whether the PRC acted arbitrarily or capriciously by dismissing the Union's amended complaint. As a preliminary matter, we find that the PRC reasonably construed the Union's amended complaint as alleging that the Postal Service's aggregate rate of compliance fell below its established goals. *See* PRC Order No. 2512,

*supra*, at 13. As previously discussed, a complaint alleging violations of service standards on an envelope-by-envelope basis does not state a cognizable claim. Rather, service standards may only be violated in the aggregate when measured against external performance goals. Thus, PRC's construction of the Union's amended complaint conforms with its interpretation of service standards discussed in Section III.B. For the reasons discussed below, we hold that the PRC's decision to dismiss the Union's amended complaint was not arbitrary or capricious.

The strongest support for upholding the PRC's dismissal is the fact that the PRC already recognized the Postal Service's failure to consistently meet its service standards, and instructed the Postal Service to take remedial action on this front. *See id.* at 13, 17, 19-20. Section 3662 allows any interested person who believes that the Postal Service is not operating in compliance with its service obligations to file a complaint. 39 U.S.C. § 3662(a). The PRC, however, may dismiss any complaint that does not raise "material issues of fact or law." *Id.* § 3662(b)(1)(A). While this phrase is not statutorily defined, it is not unreasonable to require the issue of fact or law to be one that the PRC has not already addressed. Black's Law Dictionary defines "material" as being "[o]f such a nature that knowledge of the item would affect a person's decision-making; significant; essential." *Material*, BLACK'S LAW DICTIONARY (10th ed. 2014). In this case, the PRC was already aware of the Postal Service's noncompliance with service standards, and acknowledged that this noncompliance was likely attributable to severe and uncharacteristic winter weather. ACD FY 2014, *supra*, at 88, 104. Nonetheless, the PRC instructed the Postal Service to take appropriate remedial action to ensure service compliance in fiscal year 2015. *See id.* at 104. In dismissing the Union's amended complaint, the PRC concluded that none of the

allegations brought any new facts to the PRC's attention that would cause it to modify the relief previously imposed. *See* PRC Order No. 2512, *supra*, at 13, 16-20. Because the PRC already addressed the Postal Service's noncompliance, there was nothing "material" about the Union's allegations.

In essence, the Union's amended complaint requested that the PRC issue a *different* remedial order that required the Postal Service "to cease and desist from making changes in its mail processing network that will cause it to violate service standards." Am. Compl. at 22. By articulating an alternative rationale for the Postal Service's noncompliance, the Union contends that the PRC's remedial order was ineffective to redress violations of service standards caused by post office closures. The Union, however, did not challenge the adequacy of the PRC's remedy before this Court and, accordingly, has forfeited this claim. *See Nat'l Oilseed Processors Ass'n v. OSHA*, 769 F.3d 1173, 1182 (D.C. Cir. 2014) (holding that petitioners forfeited a claim by mentioning it "only in a cursory manner"); Pet'r Br. 45 (arguing that if the PRC's statements urging the Postal Service to improve "were enforceable through agency order and court injunction, they might satisfy the Commission's duty").

Finally, the Union argues that the PRC cannot rely on its finding of noncompliance in the ACD to avoid processing a meritorious complaint on the same or similar issues. Pet'r Br. 36, 41-42. The PRC addressed a comparable concern in its March 24, 2009 Order Establishing Rules for Complaints and Rate or Service Inquiries. Specifically, the PRC agreed that "it would not give full effect to the statutory scheme if complaints could be rendered moot by the issuance of an annual compliance determination." Rules for Complaints, *supra*, at 22. The PRC does not take a contrary position in the present case. Nothing in the PRC's order states that an

individual is estopped from contesting findings in the ACD report by objecting or filing a complaint. The right to object remains intact. As shown above, the PRC's denial of the Union's amended complaint in this case was based on the fact that the complaint failed to raise a material issue of fact or law. Thus, the Union's argument on this ground is unpersuasive.

Accordingly, we hold that the PRC's dismissal of the Union's amended complaint was not arbitrary or capricious.

***

For the reasons discussed above, we deny the Union's petition. The PRC reasonably determined that whether service standards are violated must be evaluated in reference to external performance goals. Based on this interpretation, the PRC logically construed the Union's amended complaint as asserting a claim for violation of service standards in the aggregate, in accordance with the relevant performance goals. The PRC's subsequent dismissal of this amended complaint was not arbitrary or capricious because the amended complaint failed to allege new issues of material fact or law. Accordingly, the petition is denied.

*So ordered.*